IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

AUTRY PETROLEUM COMPANY and     *
MCDONALD OIL COMPANY,

          * 

       Plaintiffs,

          *

vs.

          *    CASE NO. 4:05-CV-113 (CDL)

BP PRODUCTS NORTH AMERICA, INC.   *

       Defendant.          *

          *

O R D E R

     Defendant has filed a motion for summary judgment in the above-captioned putative class action. For the following reasons, Defendant's motion (Doc. 85) is granted.

FACTUAL BACKGROUND

     Construing the evidence in the light most favorable to Plaintiffs, the record establishes the following:

     Defendant BP Products North America, Inc., one of the world's largest petroleum companies, produces, refines, and markets petroleum products. Plaintiffs, Autry Petroleum Company and McDonald Oil Company, are BP-branded "jobbers" that act as intermediaries in the distribution of BP-branded fuel to retail outlets. Plaintiffs, like all BP-branded jobbers, entered into a uniform Branded Jobber Buying Contract (the "Contract") with Defendant covering a three-year term. The Contract requires that Plaintiffs purchase a minimum amount of fuel from Defendant at a price set unilaterally by Defendant (the

"Jobber Buying Price"). Plaintiffs filed this action seeking to represent a putative class of BP jobbers who contend that BP breached the Contract by violating the Uniform Commercial Code's ("UCC") requirements of good faith. *See* UCC § 1-203 (obligation of good faith); UCC § 2-305 (open price terms); UCC § 2-311 (options and cooperation respecting performance); UCC § 2-103(1)(b) (definition of good faith). Plaintiffs claim that Defendant breached the Contract and the UCC duty of good faith by offering its jobbers a one percent prompt payment discount but then adding the cost of the discount to the Jobber Buying Price, thus effectively eliminating the benefit of the discount. Defendant responds that the Contract did not prohibit it from recovering its costs, including the cost of the prompt pay discount, in setting the Jobber Buying Price. Defendant also contends that it actually discounted the Jobber Buying Price by one percent when jobbers paid within ten days. Therefore, Defendant seeks summary judgment because it neither breached its Contract with Plaintiffs nor breached any duty of good faith under the UCC.

## I.  The Contract Price Terms

The Contract requires, among other things, each jobber to purchase a specified minimum amount of BP-branded fuel over the three-year contractual term. The Contract provides that

> [t]he price which Jobber will pay for each Product sold under this Contract will be Company's jobber buying price, as recorded at the applicable Company business unit office, regional office or other such office as Company may designate from time to time, in effect on the date and at

2

> the time of sale from the respective terminals designated
> by Company ("Jobber Buying Price").

(Ex. A to Mem. in Supp. of Def.'s Mot. to Dismiss Compl. at 2.)

Rather than establishing a set price for the fuel, the Contract

defines the Jobber Buying Price as a "price . . . in effect." (*Id.*)

Plaintiffs allege that Defendant, through its course of dealing or

performance, offered Plaintiffs a one percent "prompt payment"

discount from the Jobber Buying Price in return for payment by

electronic fund transfer within ten business days. Plaintiffs

acknowledge that no express contract term provides for this discount;

instead, Plaintiffs contend that this discount has been integrated

into the Contract by course of performance or course of dealing.

## II. Plaintiffs' Claims

Plaintiffs bring this diversity action based upon Georgia law,[1]

maintaining that "Defendant has been engaged in a calculated effort

to cheat its jobber network" "by failing to act in good faith with

regard to the manner of setting the . . . jobber buying price and in

calculating and applying the promised discount to Plaintiffs and the

---

[1]Georgia adopted the UCC in 1962. *See Johnson v. Hodge*, 223 Ga. App. 227, 228, 477 S.E.2d 385, 387 (1996) (citing 1962 Ga. Laws 156 § 1). The Court will refer to the Georgia UCC statutory provisions collectively as "the Commercial Code" or "the Code." *See* O.C.G.A. § 11-1-101 ("This Title 11 shall be known as and may be cited as the 'Uniform Commercial Code.'"). Although Georgia has not adopted the UCC's official comments into its statutory scheme, the comments are to be given "due consideration" by the Court. *See, e.g., Roswell Bank v. Atlanta Util. Works, Inc.*, 149 Ga. App. 660, 660, 255 S.E.2d 124, 125 (1979) ("[T]he legislature had the benefit of the drafters' interpretation when it enacted this statute. Therefore, due consideration should be given the official comments as we cannot say that the legislature intended something else.").

class." (Compl. ¶¶ 17, 20.) Specifically, Plaintiffs contend that "Defendant manipulates and inflates the pricing of fuel so as to deprive the Plaintiffs and the class of the agreed upon discount" by including "in the Jobber Buying Price a charge in an amount sufficient to recover the 1% discount incentive." (*Id.* ¶ 14.) Plaintiffs conclude that this action renders the stated discount "illusory." (*Id.*) Plaintiffs also contend that "Defendant actively concealed its unlawful conduct from Plaintiffs and the class" and that Plaintiffs "could not have discovered Defendant's wrongful conduct," even through an exercise of due diligence, "until shortly before this action was initiated." (*Id.* ¶ 16.)

Defendant maintains that it could not have acted in bad faith because: (1) the parties' Contract permits Defendant to unilaterally set the Jobber Buying Price; (2) Defendant never promised that it would not recoup the cost of the discount in setting that price; and (3) Defendant actually performed in accordance with any agreement for a prompt payment discount by reducing the Jobber Buying Price by one percent when payment is received within ten days. Defendant also contends that it is entitled to a presumption that its price in effect was set in good faith, in accordance with O.C.G.A. § 11-2-305 and official comment 3 to UCC § 2-305. Finally, Defendant argues that Plaintiffs failed to provide it with sufficient notice of its claims, pursuant to O.C.G.A. § 11-2-607.[2]

---

[2]In light of the Court's holding today, it is unnecessary to reach Defendant's notice argument.

4

DISCUSSION

This contractual dispute is governed by Article 2 of Title 11 of the Georgia Commercial Code, which mirrors Article 2 of the UCC.  The question here is whether genuine issues of material fact exist as to Plaintiffs' claims that Defendant breached the Contract and/or its duty of good faith by promising and providing a prompt pay discount while also adding the cost of that discount to the Jobber Buying Price paid by Plaintiffs.

## I.  Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the burden of showing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  This burden can be met by showing that the non-moving party will be unable to "establish the existence of an element essential to [the non-moving party's] case, and on which [the non-moving party] will bear the burden of proof at trial."  *Id.* at 322.

Once the moving party has met its burden, the burden shifts to the non-moving party to show that there *is* a genuine issue of material fact.  *Id.* at 324.  A fact is material if it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  There is a genuine issue if the evidence would

allow a reasonable jury to find for the non-moving party. *Id.* In other words, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

In determining whether the parties have met their respective burdens, the Court resolves "all reasonable doubts about the facts in favor of the non-movant, and draw[s] all justifiable inferences in his . . . favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotation marks and citation omitted). Additionally, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988) (internal quotation marks and citation omitted).

## II.  The Alleged Breaches of Contract

Plaintiffs base their claims upon the duties of good faith imposed upon contracting parties in transactions governed by the Commercial Code.  It is important to be precise when analyzing the good faith provisions of the Code.  First, the Code expressly imposes a duty of good faith with regard to setting open price terms. O.C.G.A. § 11-2-305(1) allows parties to "conclude a contract for sale [of goods] even though the price is not settled."  In a contract involving an open price term, "the price is a reasonable price at the

time for delivery if . . . [t]he price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded." O.C.G.A. § 11-2-305(1)(c). When one party is permitted to fix an open price term in this manner, that party must do so in good faith. *Id.* § 11-2-305(2). "Good faith" in the case of a merchant is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." *Id.* § 11-2-103(1)(b).

The Code also provides for an implied duty of good faith in the performance of every contract. *See id.* § 11-1-203. This duty requires parties "to perform substantially within the spirit and letter of a contract." *See, e.g., Stuart Enters. Int'l, Inc. v. Peykan, Inc.*, 252 Ga. App. 231, 233, 555 S.E.2d 881, 883 (2001). The purpose of the implied duty of good faith is to prevent the breach of an explicit contractual provision "*de facto* when performance is maintained *de jure.*" *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1429 (11th Cir. 1990) (applying Georgia law). However, the implied duty of good faith does not stand alone; instead, "[t]he implied covenant of good faith modifies, and becomes part of, the provisions of the contract itself. As such, the covenant is not independent of the contract." *Peykan, Inc.*, 252 Ga. App. at 234, 555 S.E.2d at 884. Accordingly, when a plaintiff cannot prevail on its underlying breach of contract claim, a plaintiff also "cannot prevail on a cause of action based on the failure to act in good faith in

7

performing the contract." *Heritage Creek Dev. Corp. v. Colonial Bank*, 268 Ga. App. 369, 374, 601 S.E.2d 842, 847 (2004); *see also Greenwald v. Columbus Bank & Trust Co.*, 228 Ga. App. 527, 529, 492 S.E.2d 248, 251 (1997) (noting that it cannot be a breach of the implied duty of good faith to perform in accordance with the express terms of a contract).

This implied duty of good faith is somewhat different from the express duty of good faith found in O.C.G.A. § 11-2-305(2). When a plaintiff's claim is based upon a violation of section 2-305, the failure to set the open price term in good faith is the breach. It is therefore unnecessary to associate a section 2-305 bad faith claim with the breach of any other independent contract term. *See, e.g., Spartan Grain & Mill Co. v. Ayers*, 517 F.2d 214, 217 (5th Cir. 1975) (applying Georgia law and finding that "[s]ince the contracts did not specify a price for the [goods], [Georgia's version of UCC § 2-305] required that the price be a 'reasonable' one; consequently, the [buyers] attempted by various methods to show that [the seller] had breached the agreement by charging an unreasonably high price" (footnote omitted)).[3]

Plaintiffs' claims appear to conflate these two similar, yet separate, duties. Plaintiffs contend that Defendant breached its duty of good faith with respect to setting the Contract's open price

---

[3]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

term and providing a "meaningful" prompt pay discount.  As described
by Plaintiffs, the two contentions are intertwined:

> If BP secretly could include all or part of the cost of the
> prompt pay discount in the Jobber Buying Price, there would
> be no prompt pay discount, and if there is no real prompt
> pay discount, BP has breached its promise to give one.  In
> playing this type of shell game, BP either is not setting
> the open price term in good faith, or it is not providing
> the promised prompt pay discount, or both.

(Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. 2 [hereinafter,
Pls.' Resp.].)  Plaintiffs' contentions thus give rise to two
distinct claims: first, a breach of the implied duty of good faith
under section 2-103, and second, a breach of the express duty of good
faith under section 2-305.  The Court will address each of these
claims in turn.

A.   Section 2-103 Implied Duty of Good Faith Claim

Plaintiffs' section 2-103 claim requires proof that Defendant
acted in bad faith with respect to a specific contractual provision.
Plaintiffs contend that Defendant contractually agreed to provide a
prompt pay discount and that section 2-103 required Defendant to act
in good faith when providing that discount.  While acknowledging that
Defendant did reduce the Jobber Buying Price with a prompt pay
discount, Plaintiffs contend that Defendant failed to provide that
discount in good faith because Defendant recouped the discount by
adding it to the Jobber Buying Price.  Consequently, according to
Plaintiffs, Defendant breached its contractual duty to provide a
prompt pay discount in good faith.

9

The first issue presented by Plaintiffs' 2-103 breach of contract claim is whether Defendant agreed to provide a prompt pay discount. Plaintiffs acknowledge that the prompt pay discount is not expressly included in the Contract, but they maintain it constitutes a material contract term under the Code's provisions for course of performance and course of dealing. *See* O.C.G.A. § 11-1-201 (defining "agreement" as "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this title (Code Sections 11-1-205 and 11-2-208)"). The Court finds for purposes of the pending motion that genuine issues of material fact exist as to whether the prompt payment discount term has been integrated into the Contract by course of dealing or course of performance.

The next issue to be resolved is whether Defendant breached its duty to provide the prompt pay discount. The Court finds that no genuine issues of material fact exist as to whether Defendant breached that provision of the parties' Contract. Plaintiffs acknowledge that they received the promised one percent discount from the Jobber Buying Price when they paid within ten days, that they benefitted from the discount's application, and that they would not receive the discount if they did not pay within ten days. (Autry, Jr. Dep. 133:5-16, Dec. 6, 2006; Autry, Sr. Dep. 62:1-64:14, Nov. 7, 2006; Gordy Dep. 98:7-99:18, Nov. 8, 2006; McDonald Dep. 72:2-19, Dec. 5, 2006.) Additionally, Plaintiffs have directed the Court to

no evidence that would allow a reasonable juror to conclude that
Defendant acted in bad faith when it performed its obligation to
provide the prompt pay discount. *See, e.g., Richard Short Oil Co.,
Inc. v. Texaco, Inc.*, 799 F.2d 415, 422 (8th Cir. 1986) (requiring
plaintiff to "show that the breach of good faith and fair dealing was
made with a prohibited motive" and precluding plaintiff from resting
"upon the mere conclusory allegation of the violation").
Furthermore, the Court rejects Plaintiffs' contention that Defendant
breached any contractual duty by recouping the cost of the discount
as part of the Jobber Buying Price. Nothing in the Contract
prevented Defendant from recouping the discount, nor did the Contract
restrict what Defendant could consider in setting the ultimate Jobber
Buying Price. To impose upon Defendant an obligation that it may not
consider any prompt payment discount costs when it determines the
price of its product would have the effect of re-writing the parties'
contract, something not authorized or contemplated by 2-103. The
Court does recognize, as discussed more fully below, that Defendant
is constrained in how it may set its price under 2-305, but that
issue is separate from the 2-103 analysis.

   The Court finds that Defendant did not breach any duty to
provide the prompt pay discount in good faith. Furthermore, to the
extent that Plaintiffs attempt to assert a general bad faith claim
disconnected from any breach of contract, the Court finds that
Plaintiffs cannot maintain a separate and independent claim for the
breach of the implied duty of good faith. Accordingly, Plaintiffs'

breach of contract claim based upon the Code's implied duty of good faith fails, and Defendant is entitled to summary judgment on that claim.

B.    Section 2-305 Express Duty of Good Faith Claim

The disposition of Plaintiffs' implied good faith claim does not resolve Plaintiffs' good faith claim pursuant to O.C.G.A. § 11-2-305, which imposes a separate and independent duty of good faith in setting an open price term. However, for the following reasons the Court finds that Plaintiffs have produced insufficient evidence from which a reasonable fact finder could conclude that Defendant breached its duty of good faith in setting the Contract's open price term. Accordingly, Defendant's Motion for Summary Judgment must also be granted as to that claim.

1.    The *Price in Effect Presumption*

When a price term is left open and a seller is required to fix a price in effect in good faith, the UCC

> rejects the uncommercial idea that an agreement that the seller may fix the price means that he may fix any price he may wish by the express qualification that the price so fixed must be fixed in good faith. Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant. (Section 2-103).   But in the normal case a "posted price" or a future seller's or buyer's "given price," "price in effect," "market price," or the like satisfies the good faith requirement.

UCC § 2-305 official cmt. 3. Defendant argues that it is entitled to avail itself of the presumption that its price in effect was set in good faith because the instant case is the "normal case." *See id.*

12

Plaintiffs concede that "**if** this were the 'normal' case, BP perhaps would satisfy the good faith requirement" but insist that "this is not the 'normal' case." (Pls.' Resp. 7.). In support of their contention, Plaintiffs rely heavily on *Allapattah Services, Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1308 (S.D. Fla. 1999) [hereinafter, *Allapattah I*], *aff'd* 333 F.3d 1248 (11th Cir. 2003).

In *Allapattah I*, the plaintiff gasoline dealers sued Exxon for breaching their uniform "Sales Agreement" supply contracts. These supply contracts contained an open price term, which was to be fixed by Exxon with respect to fluctuating market conditions. One of the factors Exxon used to set this open price term was its cost for credit card processing. *Allapattah I*, 61 F. Supp. 2d at 1311.

In the early 1980s, Exxon's branded distributors began experiencing increased operating costs and decreased demand because "private branders" were selling unbranded gasoline at prices below those of the Exxon dealers. In response, Exxon implemented a program designed to offset the credit card processing fees charged to its dealers. *Id.* at 1311-12. Under this "Discount for Cash" program ("DFC"), Exxon agreed to: (1) reduce the wholesale price of fuel (in part, to "offset the charge for credit card usage to the dealer"); (2) encourage dealers to implement different prices for cash and credit transactions; and (3) charge its dealers a three percent processing fee on all credit card receipts submitted to Exxon. *Id.* at 1312. Individual dealers were not required to participate in the

program, but the dealers were not permitted to opt out of the offset pricing scheme. The credit card processing fee applied to all dealers. *Id.*

Exxon conceded that "at a minimum, it told its dealers that it would remove from the dealer transport truck ("DTT") price an amount that 'on average' would offset the charge to dealers for credit card processing[.]" *Id.* at 1312. Exxon allegedly made only three cost adjustments to the DTT, or wholesale price, in the twelve-year period constituting the DFC program. *Allapattah I*, 61 F. Supp. 2d at 1313 n.5. The dealers sued, alleging that "in accordance with Exxon's own documents and pronouncements, Exxon was obligated to set wholesale motor fuel prices in a manner that, on average, over time, across all markets, would offset the separately imposed 3% credit cost recovery fee." *Id.* at 1313. In addition, the dealers contended that Exxon acted in bad faith by secretly dividing its dealers into two groups with the intention of using the double recovery of credit processing fees to drive one group out of business. *Id.*

Exxon responded that because its contract "explicitly provide[d] that it had the contractual authority to set the wholesale price for gasoline distributed to its dealers," it had the ultimate "authority to unilaterally set the wholesale price, and therefore, its pricing methodology cannot be a basis for establishing a breach of the Sales

Agreements."[4]  *Id.* at 1313.  Exxon also argued that it did not breach the covenant of good faith because that covenant entails only an obligation to set a reasonable price, and Exxon's prices were comparable to those of its competitors.  *Id.* at 1313-14.

The district court found that Exxon's arguments were "flawed" because

> even though Exxon had the discretionary authority
> concerning its wholesale pricing, that authority is
> expressly limited by its contractual obligation of "good
> faith," and further, by the UCC's requirement that the
> price be set in good faith. [Further], merely setting a
> price comparable to its competitors[] does not preclude a
> finding that Exxon's prices were reasonable for purposes of
> substantiating its good faith obligation.

*Allapattah I*, 61 F. Supp. 2d at 1314.  The court recognized that in the "normal case," the UCC would presume that Exxon's price in effect was set in good faith.  *Id.* at 1320; *see also* UCC § 2-305 official cmt. 3.  However, the court also determined that the facts did not present a "normal case" "[b]ecause the parties' dispute is not over the actual amount of the price Exxon charged for its wholesale gasoline to its dealers, but rather over the manner in which the wholesale price was calculated without considering the doubled charge for credit card processing[.]"  *Allapattah I*, 61 F. Supp. 2d at 1322.

---

[4]Exxon also relied on the fact that the contract contained an integration clause which "preclude[d] consideration of any terms or obligations not expressly within the four corners of the contract." *Allapattah I*, 61 F. Supp. 2d at 1313.  The district court ultimately found that while integration clauses are "strong evidence of finality" they do "not exonerate Exxon as a matter of law," and parol evidence could be used to supplement the terms of the written contract.  *Id.* at 1314, 1315.

On appeal, Exxon argued, among other things, that the district court erred in determining that a jury question existed as to whether Exxon's actions were the "normal case." *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1262 n.16 (11th Cir. 2003) [hereinafter, *Allapattah II*]. The Eleventh Circuit Court of Appeals affirmed, observing that "[t]he dealers alleged, however, that this case was not a normal case, because Exxon was attempting to drive some of the dealers out of business, and, therefore, Exxon did not satisfy the good faith requirement." *Id.* The court "agree[d] with the district court that whether this case constituted a normal case was a factual issue necessary to determine whether Exxon acted in good faith" and was therefore a jury question. *Id.*

The Court finds *Allapattah* factually distinguishable from the case at bar. However, rather than entering the *Allapattah* "normal case" thicket, the Court finds that it does not need to decide whether this case is a "normal case." Since Plaintiffs have failed to produce sufficient evidence that Defendant failed to act in good faith in setting the open price term, as explained below, Defendant is entitled to summary judgment even without the benefit of the "normal case" presumption.

>    *2. Plaintiffs' Burden to Show Bad Faith in Absence of Presumption*

Even if the section 2-305 presumption of good faith does not apply in this case, Plaintiffs must still demonstrate that genuine issues of material fact exist as to whether Defendant acted in bad

faith when setting the open price term and providing the allegedly "illusory" prompt pay discount. Georgia law defines "good faith" in the case of a merchant as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." O.C.G.A. § 11-2-103(1)(b). Plaintiffs in this case argue that *Allapattah* mandates the denial of summary judgment because their "claim and supporting material facts are in line with the *Allapattah* decision." (Pls.' Resp. 8.) While similarities between the cases certainly exist, significant factual differences between the cases require this Court to reach a different result.

a. Honesty in Fact

First, the Court must examine whether Defendant acted "honestly in fact" with respect to setting the open price term and offering the prompt payment discount. The dealers in *Allapattah* proffered evidence that Exxon did not act honestly in fact with respect to its dealers. Specifically, the dealers produced evidence that it was bad faith for Exxon

> to double charge for credit cost recovery through its price to people lacking the means to know it was happening, or to tell its dealers for twelve years who lacked the means to know otherwise that its price was net of credit costs when it was not, or to use its pricing discretion to eliminate dealers as alleged here.

*Allapattah I*, 61 F. Supp. 2d at 1322. Moreover, the dealers "specifically claim[ed] that Exxon exercised bad faith based on Exxon's plan to double charge for the purpose of running [some] dealers out of business." *Id.* In other words, the dealers produced

17

evidence that Exxon undertook an affirmative obligation to price its wholesale gasoline in a particular way, failed to perform its obligation, and then lied to its dealers in an effort to avoid its obligation and intentionally drive selected dealers out of business. Accordingly, the *Allapattah I* court determined that a jury could conclude that Exxon did not act "honestly in fact" with respect to its dealers. *Id.* at 1323 ("By adopting and implementing its program, a duty arose to carry it out 'honestly in fact' in favor of each dealer, and all dealers nationally, to accomplish the 'on average' reduction.").

In this case, although Plaintiffs allege that Defendant's subjective intent was to "cheat its jobber network" (Compl. ¶ 17), Plaintiffs have failed to produce evidence of dishonesty in fact similar to that found in *Allapattah*. In contrast to *Allapattah*, Plaintiffs concede that Defendant made no promise that it would calculate the Jobber Buying Price by any particular method, and every jobber that paid promptly actually received a one percent discount from the Jobber Buying Price. (Autry, Jr. Dep. 93:8-21; McDonald Dep. 113:21-114:25); *see also Allapattah I*, 61 F. Supp. 2d at 1310 (refusing to "adopt [the] conclusion that, to the extent that a duty to impose duplicative charges on the dealers for the cost of credit card processing does not arise from the express language of the contract, such a term may be implied as a matter of law").

Plaintiffs also do not contend that Defendant was using the recouped discount in a discriminatory manner or in an effort to drive selected jobbers out of business. "It is abundantly clear . . . that the chief concern of the UCC Drafting Committee in adopting § 2-305(2) was to prevent *discriminatory* pricing—i.e., to prevent suppliers from charging two buyers with identical pricing provisions in their respective contracts different prices for arbitrary or discriminatory reasons." *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1346-47 (D. Kan. 1996). In *Allapattah*, the Eleventh Circuit mentioned only the allegations that Exxon was using its pricing methodology to drive certain dealers out of business as evidence of Exxon's bad faith. *Allapattah II*, 333 F.3d at 1262 n.16 (observing that "[t]he dealers alleged, however, that this case was not a normal case, because Exxon was attempting to drive some of the dealers out of business, and, therefore, Exxon did not satisfy the good faith requirement"). Unlike the dealers in *Allapattah*, Plaintiffs in this case have directed the Court to no evidence that would support their contention that Defendant acted with subjective dishonesty in setting the Jobber Buying Price.

      b.    Observance of Reasonable Commercial Standards

Even though Plaintiffs have failed to produce sufficient evidence of subjective bad faith, Plaintiffs can still survive Defendant's motion by producing evidence that Defendant failed to observe reasonable commercial standards in setting the open price

19

term. The *Allapattah I* court specifically mentioned the importance of inquiry into reasonable commercial standards. 61 F. Supp. 2d at 1325 n.25 (noting that the concept of "good faith" expressly includes an analysis of whether a merchant observes "reasonable commercial standards of fair dealing in the trade, so that throughout that Article **wherever a merchant appears in the case an inquiry into his observance of such standards is necessary to determine his good faith**") (quoting UCC § 1-201 official cmt.). However, "[b]ecause there is no precise definition of the term 'commercial reasonableness,' the facts of the case will be determinative of whether conduct is commercially reasonable." *Id.* at 1323 (citation omitted). In *Allapattah I*, the court concluded that based upon the particular circumstances of the case, Exxon's conduct was commercially unreasonable. *Id.* at 1324. Specifically, the court found that Exxon's commitment to offset the dealer's prices throughout the twelve-year DFC program period was "not illusory," and the evidence indicated that Exxon did not perform its obligation. *Id.* Moreover, the court observed that the dealers specifically alleged that Exxon was utilizing the DFC program to drive some dealers out of business, which was clear evidence that Exxon was acting "contrary to well-established tenets of contract law." *Id.*

The commercial reasonableness test reemphasizes the aforementioned distinctions between the facts of *Allapattah* and those of the instant case. Again, this case lacks the breach of a specific

pricing promise that could be construed as evidence that Defendant acted in a commercially unreasonable manner. In this case, the Contract specifically gives Defendant the unilateral right to set the Jobber Buying Price, and the parties concede that there was no agreement regarding how this price was to be set. (Autry, Jr. Dep. 93:8-21; McDonald Dep. 113:21-114:25.) Plaintiffs admit that the Jobber Buying Price was discounted by one percent when they paid within ten days and that they would not receive the discount if they did not pay within ten days of being invoiced. (Autry, Jr. Dep. 133:5-16; Autry, Sr. Dep. 62:1-64:14; Gordy Dep. 98:7-99:18; McDonald Dep. 72:2-19.) This case also lacks any allegations of discriminatory pricing that may support a finding of commercial unreasonableness.

Furthermore, Plaintiffs point the Court to no evidence to show that Defendant's conduct violated the parties' commercially reasonable expectations. The *Allapattah I* court noted that because the goals of the good faith doctrine are "to effectuate the intentions of the parties or to honor their reasonable expectations[,]" the duty of good faith "requires performance of contractual obligations faithfully as to an agreed common purpose and consisten[t] with the justified expectations of the other party." *Allapattah I*, 61 F. Supp. 2d at 1319 (internal quotation marks and citations omitted) (second alteration in original). When Plaintiffs' claims are reduced to their essence, they reveal that Plaintiffs'

grievance is that Defendant should not have recouped the cost of the discounts by adding them to the Jobber Buying Price. While this argument is superficially appealing, Plaintiffs do not direct the Court to any evidence indicating that Defendant's actions were commercially unreasonable.[5] Instead, the record discloses that: (1) the named Plaintiffs in this case do not know how other branded companies set their prices or whether they recoup the cost of their prompt payment discounts; (2) there was never a meeting of the minds regarding how Defendant would set the Jobber Buying Price; and (3) Plaintiffs did not expect Defendant to share the details of its pricing methodology with them. (Autry, Jr. Dep. 92:9-94:7; 98:17-

---

[5]The affidavit of Daniel E. Autry, Jr., Vice-President and Chief Financial Officer of Plaintiff Autry Petroleum makes some reference to the commercial unreasonableness of Defendant's practices. Autry, Jr. has a Master's Degree in Management and is a Certified Public Accountant. In his affidavit, Autry, Jr. contends that the terms of the one percent prompt payment discount are commercially unreasonable because the terms "only speed collections by five days and equate to an annual borrowing rate to BP in excess of 72%. This rate of interest to be paid on receivables is impossible to justify on financial terms[.]" (Autry, Jr. Aff. 10, Jan. 16, 2006.) However, Autry, Jr. also concedes in his deposition that he is unfamiliar with how the prompt pay discount could affect Defendant's arrangements with its terminals and other customers, and he acknowledges that Defendant could reasonably use its business judgment to finance its transactions by using a prompt pay discount. (Autry, Jr. Dep. 65:15-69:19.) Autry, Jr.'s affidavit also contains a copy of a letter from the BP Amoco Marketer's Association indicating a price disparity of ten to thirteen cents between BP and other major petroleum companies. (Ex. K to Autry, Jr. Aff.) However, Plaintiffs do not explain whether this disparity is commercially unreasonable, particularly in light of the notoriously volatile nature of the petroleum industry. Finally, the Autry, Jr. affidavit alleges that "it appears that BP perceives its Jobber customer base in the US to be a depleting asset and that BP is proactively managing that decline" in part, by using "fictitious pricing . . . that has had the effect of shortening the life expectancy of all Jobbers if not threatening their very existence." (Autry, Jr. Aff. 9.) Again, Plaintiffs do not demonstrate that even if these allegations are true that Defendant's actions are beyond the scope of reasonable, commercial practices in the petroleum industry.

100:10; Gordy Dep. 81:7-82:2.)  Put differently, Plaintiffs in this case give no objective basis for their expectation that it was commercially unreasonable for Defendant to consider the prompt payment discount when it set its Jobber Buying Price.

This Court must respect and enforce the parties' bargain as expressed in their Contract.  That Contract gave Defendant the right to set the price of gasoline sold to its jobbers.  While that right is circumscribed by the duty of good faith, Plaintiffs have failed to produce sufficient evidence indicating either that the actual price set by Defendant or Defendant's price-setting methodology was objectively commercially unreasonable, or that Defendant set the price term with the bad faith intent to cheat its jobber network. Rather, the evidence indicates that Defendant acted in accordance with the parties' Contract in setting the open price term and providing a genuine discount from the Jobber Buying Price. Accordingly, Plaintiffs have failed to create a genuine issue of material fact as to whether Defendant acted in bad faith by recouping the cost of the prompt pay discount when it set the open price term of the parties' Contract.  Defendants are therefore entitled to summary judgment on Plaintiffs' claims to the extent they assert a breach of contract for failure to set the open price term in good faith.

CONCLUSION

For the reasons stated herein, the Court grants Defendant's Motion for Summary Judgment (Doc. 85).


IT IS SO ORDERED, this 8th  day of February, 2008.



 S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE